UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES B. FUSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00817-RLY-DML |
| | ) | |
| CITY OF INDIANAPOLIS, acting by and through its Metropolitan Police Department, RONALD BURGESS, SGT. MICHAEL CRODDY, and OFFICER C. BUTLER, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S MOTION FOR LEAVE TO CORRECT BRIEF**

Plaintiff, James B. Fuson, filed this action against Defendants, the City of

Indianapolis, acting by and through its Metropolitan Police Department, Detective

Ronald Burgess, Sergeant Michael Croddy, and Sergeant Charles Butler, for claims

arising out of the events leading to his arrest in November 2012 for invasion of privacy.

Plaintiff has alleged violations of the Fourth Amendment to the U.S. Constitution, made

actionable via 42 U.S.C. § 1983, and Indiana tort law.  This matter now comes before the

court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Leave to

Correct Brief.  For the reasons set forth below, the court **GRANTS IN PART**

Defendants' motion and **DENIES** Plaintiff's motion.

1

## I. Legal Standard

The court is required to enter summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). The court construes the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016).

## II. Statement of Material Facts

### A. Culhane Obtains a Protective Order against Plaintiff

Plaintiff and Katrina Culhane have been in a relationship for approximately eight years, and they have a child, "A.F." (Filing No. 54-1, Deposition ("Dep.") of James Fuson 7:13-8:18; Filing No. 54-2, 2015 Dep. of Katrina Culhane 27:23-25). Culhane filed a petition for an order of protection in Johnson County, Indiana on October 2, 2012. (Filing No. 44-5, Petition for an Order of Protection). At the hearing on Culhane's petition, the Honorable Richard L. Tandy issued an order for protection that prohibited Plaintiff from, *inter alia*, harassing and annoying Culhane, (Filing No. 44-4, Transcript of Protective Order Hearing 2:13-14; Filing No. 44-3, Protective Order), and granted Culhane temporary physical custody of A.F. (Transcript of Protective Order Hearing 9:12-13). Plaintiff told Judge Tandy that he was worried about his daughter's safety

2

while in Culhane's care. (*Id.* 9:17-19). Judge Tandy instructed Plaintiff that if he had any concerns about the welfare of his daughter, he should "call Protective Services." (*Id.* 9:20-23).

### B. Plaintiff Requests First Welfare Check and Later Requests Results

On October 3, 2012, the day after the protective order was issued, Plaintiff called Indiana's Child Protective Services ("CPS") and raised concerns about his daughter. (Filing No. 45-6, Plaintiff's Cellphone Records A14:588; Plaintiff Dep. 21:18-23:10, 64:22-65:7). CPS informed him it would take "a few days to a week to get out to check on [his claims], and if [he] . . . had an immediate concern, the police would go out and check immediately." (Plaintiff Dep. 15:3-11; Filing No. 1, Complaint ¶ 16). CPS suggested that Plaintiff call for a welfare check. (*Id.*).

On October 3, 2012 at 8:10 p.m., Plaintiff placed his first call requesting a welfare check at 6254 Wilshire Drive, where Culhane was living with A.F. (Plaintiff Dep. 96:25-97:7; Filing No. 45-3, Affidavit ("Aff.") of William Ross ¶ 5; Filing No. 45-4, Marion County Sheriff's Office Audio Records Log; Filing No. 45-5, Audio from Plaintiff's Calls to Police Dispatch, Tracks 1-2; Cellphone Records A14:603). During that call, he informed the dispatcher that Culhane's protective order prevented him from checking on the welfare of his child. (Filing No. 45-7, Audio Transcripts of Calls to Police Dispatch, Investigation ("Inv.") 1 at 3-4; Plaintiff's Call Audio, Track 2). He also said that he was concerned because Culhane "drinks a lot" and does not take care of their daughter. (Audio Transcripts, Inv. 1 at 3; Plaintiff's Call Audio, Track 2). The dispatcher stated,

"I'm going to call you back after the officers go there and I'll let you know what happened . . . ."  (Audio Transcripts, Inv. 1 at 4; Plaintiff's Call Audio, Track 2).

On October 3, 2012, Indianapolis Metropolitan Police Department ("IMPD") officers performed a welfare check at 6254 Wilshire Drive.  (Ross Aff. ¶¶ 5-8).  The officers found that A.F. was happy and healthy, the house was clean, and that Culhane appeared to be sober.  (*Id.* ¶ 8).

No one called Plaintiff to inform him of the results of this welfare check.  Consequently, Plaintiff called Marion County Dispatch at 11:07 p.m. on October 3, 2012 to check the status of the welfare check.  (Audio Records Log; Audio Transcripts, Inv. 2 at 2-3; Plaintiff's Call Audio, Tracks 3-4; Cellphone Records A14:613).  During that call, Plaintiff implied that he was expecting to receive a call back.  (Audio Transcripts, Inv. 2 at 2; Plaintiff's Call Audio, Track 4).  The dispatcher responded, "Generally we don't. You're always welcome to call and check on it."  (*Id.*).  The dispatcher later stated, "Apparently everything checked out okay sir from what I can see."  (Audio Transcripts, Inv. 2 at 3; Plaintiff's Call Audio, Track 4).  Plaintiff asked for more information, but the dispatcher said, "We don't go into details."  (*Id.*).  Plaintiff responded that "they must have found her okay," and the dispatcher agreed.  (*Id.*).

### C. Plaintiff Requests Second Welfare Check

Plaintiff requested a second welfare check at 6254 Wilshire Drive on October 4, 2012 at 8:44 p.m.  (Audio Records Log; Audio Transcripts, Inv. 3 at 2; Plaintiff's Call Audio, Tracks 5-6; Cellphone Records A15:638).  During that call, he informed the dispatcher that he was requesting the welfare check because his daughter was "in her

4

mother's care and she's in danger . . . because her mother doesn't keep a good eye on her, and doesn't wash her at all."  (Audio Transcripts, Inv. 3 at 3; Plaintiff's Call Audio, Track 6).  Plaintiff specifically requested that the police examine A.F. for bruises. (Audio Transcripts, Inv. 3 at 4; Plaintiff's Call Audio, Track 6).  Plaintiff asked if someone would call him back after the officers completed the welfare check and the dispatcher replied, "Yeah they can if not you can call us back."  (Audio Transcripts, Inv. 3 at 3; Plaintiff's Call Audio, Track 6).

On October 4, 2012, officers were dispatched to 6254 Wilshire Drive where they performed a second welfare check.  (Ross Aff. ¶¶ 9-11).  There were no signs of alcohol or child abuse.  (*Id.* ¶ 11).  During this welfare check, Culhane expressed frustration and told Officer Ross that she had a protective order against Plaintiff.  (*Id.* ¶ 12).  She did not file an official harassment report though.  (*Id.* ¶ 13).  After leaving the residence, Officer Ross told Sgt. Croddy he believed Plaintiff was using law enforcement to circumvent a valid protective order.  (*Id.* ¶ 14).

### D. Culhane Files a Harassment Complaint against Plaintiff

At 12:34 a.m. on October 6, 2012, Culhane called Marion County Dispatch to report that Plaintiff was harassing her.  (Filing No. 46-1, Audio from Culhane's Call to Police Dispatch, Tracks 1-2).  During her call, Culhane explained that she had a protective order against Plaintiff and police had come out to her house the "last couple nights to do a welfare check, and then [that day] . . . CPS [came] to the house."  (*Id.* at Track 2).

5

**E. Plaintiff Requests Third Welfare Check and Later Requests Results**

At 7:42 p.m. on October 6, 2012, Plaintiff called Marion County Dispatch to request a third welfare check at 6254 Wilshire Drive. (Audio Records Log; Audio Transcripts, Inv. 4 at 2; Plaintiff's Call Audio, Tracks 7-8; Cellphone Records A16:702). Plaintiff did not ask for the results of the second welfare check. (Plaintiff Dep. 116:11-117:9). He informed the dispatcher that he wanted the welfare check to be performed because he was concerned that his daughter may not have warm clothes, her mother neglects her, and her mother's family has a history of domestic violence. (Audio Transcripts, Inv. 4 at 2; Plaintiff's Call Audio, Track 8). He also informed the dispatcher that Culhane's protective order prevented him from personally checking on the welfare of his child. (*Id.*).

Officer Ross was dispatched for a third time to 6254 Wilshire Drive to perform a welfare check on October 6, 2012. (Ross Aff. ¶ 15). Officer Ross observed no signs of child abuse. (*Id.* ¶ 17). During this welfare check, Culhane was visibly upset, and she told Officer Ross that she felt she was being harassed. (*Id.* ¶ 18). Officer Ross relayed Culhane's concerns to Sgt. Croddy. (*Id.* ¶ 20).

Plaintiff called to check on the status of his third requested welfare check at 1:13 a.m. on October 7, 2012. (Audio Records Log; Audio Transcripts, Inv. 5 at 2; Plaintiff's Call Audio, Tracks 9-10; Cellphone Records A16:710). Plaintiff was informed that "an officer went out there and they made an information report." (Audio Transcripts, Inv. 5 at 3; Plaintiff's Call Audio, Track 10). Plaintiff asked, "So did they check on her and she's okay?" (*Id.*). The dispatcher stated that she did not know the results of the welfare

6

check, but that Plaintiff could call back between 2:00-10:00 p.m. and speak with the officer that was dispatched to the home.  (Audio Transcripts, Inv. 5 at 3-4; Plaintiff's Call Audio, Track 10).

### F. Culhane Requests that Plaintiff Be Held in Contempt

On October 9, 2012, Culhane filed a letter with the Johnson Superior Court requesting that Plaintiff be held in contempt because she had a protective order against him and "he ha[d] been breaking it by harassing [her] at [her] home."  (Filing No. 45-1, Culhane's Letter to Johnson Superior Court at 1).  In her letter, Culhane wrote that police had been to her house to perform welfare checks on October 3, October 4, and October 6, 2012.  (*Id.*).  Her letter stated that CPS had come to her house on October 6 because Plaintiff "told them [she] kidnapped [their] daughter."  (*Id.*).  Her letter also stated that she had called the "police and filed harassment [sic] against him."  (*Id.*).

### G. Sgt. Croddy Speaks with Culhane Regarding Harassment Claim

Sgt. Croddy contacted Culhane after she complained that an officer did not make an official police report regarding the welfare checks.  (Filing No. 55-1, Dep. of Sgt. Michael Croddy 8:7-10:8).  While speaking with Culhane, Sgt. Croddy noticed that she "sounded pretty frightened," and he learned that she had been the victim of a "serious bodily injury" perpetrated by Plaintiff.  (*Id.* 10:1-14).  Sgt. Croddy conducted an investigation to verify Culhane's claims, and learned about Plaintiff's criminal history, Culhane's protective order, and the three welfare checks performed at Plaintiff's request. (*Id.* 10:19-11:18).

### H. Sgt. Croddy Allegedly Speaks with Plaintiff

Sgt. Croddy claims that around this time, although he is unsure of the exact day,

he called Plaintiff regarding his welfare check requests.  (*Id.* 17:16-19:20).  Sgt. Croddy

did not document this alleged call, (*id.* 37:19-21), but the call stands out to him because

"it wasn't the most friendly [sic] conversation."  (*Id.* 19:3-4).  According to Sgt. Croddy,

he told Plaintiff welfare checks had been performed, A.F. was safe in her mother's care,

and Plaintiff needed to stop calling the police because he was violating Culhane's

protective order.  (*Id.* 19:13-15, 25:22-25, 37:3-18, 46:7-19).

Plaintiff, however, claims he never received a call from Sgt. Croddy.  (Plaintiff

Dep. 138:17).  Sgt. Croddy told Internal Affairs that he called Plaintiff's cell phone using

his personal cell phone and that the incoming call would appear as a blocked phone

number on Plaintiff's cell phone.  (Filing No. 55-2, Internal Affairs Investigation

Transcript at 4).  However, Plaintiff did not accept calls from blocked phone numbers

because he was worried Culhane might attempt to contact him and have him

inadvertently violate the protective order.  (Plaintiff Dep. 148:12:19).  Further, Plaintiff's

cell phone records do not indicate a single incoming call from a blocked phone number.

(Cellphone Records).

### I. Plaintiff Requests Fourth Welfare Check

Plaintiff called Marion County Dispatch to request a fourth welfare check at 7:30

p.m. on October 10, 2012.  (Audio Records Log; Audio Transcripts, Inv. 6 at 2;

Plaintiff's Call Audio, Tracks 11-12; Cellphone Records A19:836).  Plaintiff did not

request an update on the welfare checks that he previously requested.  Plaintiff told the

dispatcher that Culhane is a "horrible mother" who neglected and abused A.F. (Audio Transcripts, Inv. 6 at 2; Call Audio, Track 12). He asked if someone would call him back after the welfare check, and the dispatcher informed him that he would "probably have to call back and find out" what happened. (*Id.*).

### J. Sgt. Croddy Directs Officers Not to Perform Plaintiff's Welfare Checks

Sgt. Croddy asked dispatch to place a "flag" on Culhane's address to "document that [they] did not actually have to send the officer out" anymore. (Croddy Dep. 35:2-4). Sgt. Croddy wanted dispatch "just to document these calls were coming in." (*Id.* 35:7-8; *see id.* 27:1-4). Importantly, Sgt. Croddy adamantly asserts he never told dispatchers to withhold information about the welfare checks in an effort to induce Plaintiff to keep calling and be arrested for invasion of privacy. (*Id.* 24:23-25:14, 26:21-27:1). According to Sgt. Croddy, "I was not looking to build a case against Mr. Fuson." (*Id.* 26:2-3).

In 2014, Culhane testified that law enforcement officers told her they would actively withhold information from Plaintiff. (Filing No. 45-2, 2014 Dep. of Culhane 20:3-5 (Q: But [officers] did specifically tell you that they weren't going to contact [Plaintiff] as stated in your letter? A: Correct. Yes.")). However, she rejected the idea that the purpose of this was to build an invasion of privacy case against Plaintiff. (*Id.* 19:15-17 ("The reason why they were not gonna contact him is because they already let him know the first two times . . . that his daughter was okay.")). Culhane has since reconciled with Plaintiff and begun living with him. (2015 Culhane Dep. 56:21-57:2; Plaintiff Dep. 7:12-19). In her 2015 deposition, she testified as follows:

Q: [B]oth officers who came out in person to perform the welfare checks told you they were going to build a case against James Fuson for invasion of privacy?

A: Yes

Q: And Officer Croddy later told you the same thing?

A: Yes.

. . .

Q: So I just want to get this clarified on the record.  You were told at different times by different officers that . . . Mr. Fuson was not going to be informed of the calls . . . and that they were building a case against Mr. Fuson for invasion of privacy?

A: Yes.[1]

(2015 Culhane Dep. 109:15-110:21).

### K. Plaintiff Asks for Results of Fourth Welfare Check

Plaintiff called to check on the status of his fourth requested welfare check at 8:59 p.m. on October 10, 2012.  (Audio Records Log; Audio Transcripts, Inv. 7 at 2; Plaintiff's Call Audio, Tracks 13-14; Cellphone Records A19:841).  During that call, Plaintiff learned that officers did not perform a fourth welfare check per a sergeant's order.  (Audio Transcripts, Inv. 7 at 2; Plaintiff's Call Audio, Track 14).  The dispatcher explained, "It's-it's something to have to do with-with what the sergeant basically has

---

[1] In the face of this testimony, and other testimony from this transcript (*see, e.g.,* 2015 Culhane Dep. 111:2-22), Defendants boldly declare, "Katrina never testified that Croddy, or any of the Defendants, told her that he was withholding information from Plaintiff to build a case against him."  (Defendants' Reply at 10).  (*See also id.* at 4 ("Plaintiff claims that Katrina testified that Croddy told her that he would withhold information about the welfare checks from Plaintiff to induce Plaintiff into making additional calls so that he could build a case against him.  Katrina never offered such testimony.")).  Whether an intentional attempt to deceive the court or an accidental oversight, Defendants are patently wrong on the facts.

told the officer, so I guess they've already checked on and everything is fine."  (*Id.*).

Plaintiff requested the name of the sergeant who instructed officers not to perform the

welfare check.  (*Id.*)  When Plaintiff learned this instruction came from Sgt. Croddy, he

requested that Sgt. Croddy call him.  (Audio Transcripts, Inv. 7 at 3; Plaintiff's Call

Audio, Track 14).

### L. Plaintiff Requests Fifth Welfare Check and Later Requests Results

Plaintiff called Marion County Dispatch and requested to speak with Sgt. Croddy

at 1:26 p.m. on October 11, 2012.  (Audio Records Log; Audio Transcripts, Inv. 8 at 2;

Plaintiff's Call Audio, Tracks 15-16; Cellphone Records A19:854).  Plaintiff told the

dispatcher that Sgt. Croddy was supposed to call him back the night before.  (Audio

Transcripts, Inv. 8 at 2; Plaintiff's Call Audio, Track 16).  The dispatcher responded that

Sgt. Croddy worked during the middle shift and was not working at that time.  (*Id.*).

Plaintiff expressed frustration that officers had not conducted a welfare check on October

10, and then requested a fifth welfare check at 6254 Wilshire Drive.  (Audio Transcripts,

Inv. 8 at 3-4; Plaintiff's Call Audio, Track 16).  Plaintiff stated that the welfare check was

necessary because "[h]er mother just completely neglects her," and he wanted to ensure

that A.F. was not bruised.  (Audio Transcripts, Inv. 8 at 5; Plaintiff's Call Audio, Track

16).

Plaintiff then called the Marion County Dispatch at 3:46 p.m. on October 11,

2012, to check on the results of his fifth welfare check request.  (Audio Records Log;

Audio Transcripts, Inv. 9 at 2; Plaintiff's Call Audio, Tracks 17-18; Cellphone Records

A20:862).  The dispatcher stated he was unable to determine what happened with regard

to the fifth request, so he would have Officer Spidly call Plaintiff in fifteen minutes to an hour.  (Audio Transcripts, Inv. 9 at 4; Plaintiff's Call Audio, Track 18).

**M. Sgt. Croddy Prepares to Arrest Plaintiff at the Roll Call Office**

A few moments later, Sgt. Croddy attempted to speak with Plaintiff by calling via a private number.  (Croddy Dep. 71:1-24).  At 4:13 p.m., Plaintiff called the Marion County Dispatch and stated that he had missed a call from a private number.  (Audio Records Log; Audio Transcripts, Inv. 10 at 2; Plaintiff's Call Audio, Tracks 19-20; Cellphone Records A20:863).  The dispatcher stated that the private number was an officer attempting to call him about the welfare checks.  (Audio Transcripts, Inv. 10 at 2; Plaintiff's Call Audio, Track 20).  Plaintiff responded that he could not answer calls from private numbers.  (*Id.*).  Accordingly, the dispatcher stated that Plaintiff should go to the roll call office at 1150 South Shelby Street to speak with Sgt. Croddy.  (*Id.*).  Sgt. Croddy was delayed by traffic, and Plaintiff left the roll call office before he arrived.  (Croddy Dep. 16:10-17:1).  Plaintiff had to leave in order to attend a class at Ivy Tech Community College, but he left a note for Sgt. Croddy explaining that he wanted to speak to a police officer regarding the results of a welfare check and the reason law enforcement declined to do a welfare check the night before.  (*See* Filing No. 54-5, Note Left at South District HQ).

Sgt. Croddy believed that Plaintiff was "trying to manipulate the system and continue violating the protective orders in order to harass his ex-girlfriend."  (Croddy Dep. 50:122-25).  Thus, while driving to meet Plaintiff, Sgt. Croddy spoke with an on-duty prosecutor about whether probable cause existed to perform an outright arrest on

12

Plaintiff at the roll call office.  (*Id.* 15:13-21, 56:2-14, 73:1-5, 80:22-81:18).  After Sgt. Croddy confirmed that the protective order had been served, the prosecutor advised that there was probable cause for an arrest.  (*Id.* 15:13-21, 56:2-14, 73:1-5).

### N. Sgt. Croddy Seeks a Warrant for Plaintiff's Arrest

Because Plaintiff had left the roll call office, Sgt. Croddy was advised to seek a warrant for Plaintiff's arrest.  (*Id.* 17:12-15).  Sgt. Croddy then prepared a police report in response to Plaintiff's fifth welfare check request.  (Croddy Dep. 74:15-75:4, 75:22-76:1; Filing No. 46-4, Case Report: 12-0144631).  Sgt. Croddy drafted this report, in part, to outline the elements that would support probable cause that Plaintiff had committed an invasion of privacy under the Indiana Criminal Code.  (*Id.* 76:2-9).

### O. Sgt. Butler Meets with Plaintiff at Ivy Tech Regarding Jason Squire

Later that night, Sgt. Butler met with Plaintiff at Ivy Tech.  (Dep. of Sgt. Charles Butler 21:10-21).  Sgt. Butler wanted to meet with Plaintiff after Jason Squire expressed concerns regarding a letter that Plaintiff had left at a home belonging to Squire's elderly parents.  (*Id.* 11:1-15).  Plaintiff knows Squire because Squire once carried on a two-day romance with Culhane, and Plaintiff wanted Squire to be a witness in his custody dispute with Culhane.  (2015 Culhane Dep. 64:14-15; Plaintiff Dep. 32:5-34:5).  Sgt. Butler claims to only know Squire in his capacity as "a lead person" in a band that he enjoys watching.  (Butler Dep. 9:3-21).  Sgt. Butler testified that he does not know Squire socially, he is not related to Squire, and he has never lived with Squire.  (*Id.* 10:3-12, 36:19-20).  According to Culhane though, Sgt. Butler and Squire were roommates during her dalliance with Squire.  (2015 Culhane Dep. 112:1-2).  She also testified that Sgt.

Butler and Squire vacationed together, and Sgt. Butler had "got [Squire] out of tickets before." (*Id.* 112:23-25).

Plaintiff left a note on what he thought was Squire's front door asking Squire to fill out an affidavit describing some of Culhane's misconduct. (Filing No. 54-4, Note Left for Jason Squire). The note states that if Squire did not provide an affidavit, Plaintiff would have to subpoena him into court and that he would be arrested if he failed to comply with the subpoena. (*Id.*). Squire felt that this note was intimidating, and he was concerned for his parents' safety. (Butler Dep. 13:2-24). He raised these concerns to Sgt. Butler after a performance a week or two before Sgt. Butler confronted Plaintiff at Ivy Tech. (*Id.* 10:16-20). In the process of attempting to locate Plaintiff so as to address Squire's concerns, Sgt. Butler learned of Culhane's harassment complaint against Plaintiff. (*Id.* 18:25-19:13).

Sgt. Butler was off duty but in full uniform when he came to Ivy Tech to speak to Plaintiff. (*Id.* 21:22-22:1). According to Sgt. Butler, he told Plaintiff that Squire did not want Plaintiff at his parents' house and to stay away from that house. (*Id.* 23:22-24). He also told Plaintiff that he could be arrested for invasion of privacy if he violated Culhane's protective order. (*Id.* 24:10-12). Sgt. Butler claims that he was "very firm and direct" with Plaintiff, and that he had to speak loudly in order to be heard over the nearby machinery. (*Id.* 25:13-22). Sgt. Butler testified that Plaintiff was free to leave at any time during the course of this conversation. (*Id.* 27:17-19, 43:4-5).

According to Plaintiff, Sgt. Butler "exploded" and screamed "right in [his] face." (Plaintiff Dep. 30:6-8). Sgt. Butler "would just yell right over" Plaintiff whenever he

tried to answer a question.  (*Id.* 30:22-23).  Plaintiff testified that Sgt. Butler also said

"that he was going to make sure that [Plaintiff's] custody case was ruined."  (*Id.* 30:25-

31:2).  Sgt. Butler told Plaintiff that he "couldn't go around Jason Squire . . . [or] call for

a welfare check."  (*Id.* 105:5-10).  Plaintiff wanted to end the conversation and go back to

class, but he did not feel that he could leave because Sgt. Butler "was yelling at [him] and

ordering [him] to do things."  (Filing No. 55-4, Declaration ("Dec.") of Plaintiff ¶ 9).

After this encounter, Plaintiff did not call in anymore welfare checks.

### P. Det. Burgess Prepares a Probable Cause Affidavit

Sgt. Croddy spoke to Det. Burgess and worked with him to gather information to

prepare a probable cause affidavit.  (*Id.* 20:1-21:8, 79:6-81:18; Filing No. 54-3, Dep. of

Det. Ronald Burgess 12:13-14:17; *see* Filing No. 46-5, Probable Cause Affidavit).  Sgt.

Croddy testified, "I don't remember everything that was discussed, but I believe I told

[Det. Burgess] that I had called [Plaintiff] and told him not only that his daughter was

okay, [but also] that there's a protective order involved . . . ."  (Croddy Dep. 79:8-11).

Det. Burgess gathered the remainder of the information included in his probable cause

affidavit from speaking with officers and reviewing computer aided-dispatch reports,

police reports, Culhane's protective order, and Plaintiff's criminal history.  (Burgess Dep.

11:3-23, 12:13-13:7, 29:8-31:17, 35:3-13, 36:20-37:8).  Det. Burgess believes that he did

not review the audio tapes of Plaintiff's conversations with dispatch because the audio

tapes were not yet available.  (*Id.* 11:24:-12:9).

The Probable Cause Affidavit summarizes Plaintiff's five requests for welfare

checks, the three welfare checks that were conducted in response, Plaintiff's call to CPS,

Jason Squire's concerns, and Culhane's protective order.  (Probable Cause Affidavit).  Of particular importance in this case is that the affidavit states: (1) after the first welfare check was conducted, "James Fuson was informed that everything was ok"; (2) after the second welfare check was conducted, "James Fuson was informed that everything was ok at the residence"; and (3) in the concluding section, "Even after Police notified James that everything was fine he was using police to harass Katrina."  (*Id.*).

### Q. Plaintiff is Charged with Invasion of Privacy

Detective Burgess filed the Probable Cause Affidavit on October 17, 2012.  (*Id.*).  Plaintiff was then charged with invasion of privacy for violating a protective order.  (Filing No. 46-7, Charging Information).  The case was dismissed on February 28, 2013.  (Complaint ¶ 31.)

### III. Plaintiff's Motion for Leave to Correct Brief

Plaintiff requests permission to amend his Brief in Opposition to Defendants' Motion for Summary Judgment on the basis that his citation to evidence is "incomplete."  Plaintiff's amended brief contains only two corrections: (1) changing a citation from "Culhane Dep., p. 109" to "Culhane Dep. pp. 108-11" on page 4, and (2) making that same change on page 20.  Defendants object to Plaintiff's motion on many grounds.  They highlight that Plaintiff's motion was filed twenty-three days after his response brief and, perhaps more importantly, nearly a week after Defendants' reply brief.  Consequently, Defendants argue that Plaintiff's motion is a thinly veiled attempt to rebut arguments raised in their reply brief, which is generally not permitted.  Defendants also contend that they would be prejudiced if the court permitted the amendment.  Among

other reasons, Defendants aver that they utilized the full twenty pages permitted under

Local Rule 7-1(e)(1) when drafting their reply brief, and, if Plaintiff is permitted to

amend, the pages dedicated to addressing this purported evidentiary deficiency would

have been wasted.  Defendants could have used those pages to advance other arguments.[2]

As Defendants note, Plaintiff's motion is curiously absent of any authority to

warrant the proposed amendment.  It is not until Plaintiff's reply brief that he invokes

Federal Rule of Civil Procedure 15 in support of his motion.  Rule 15(a) allows a party to

amend a pleading "as a matter of course" or with leave of the court, depending upon the

circumstances.  However, the plain language of this rule leaves no doubt that it only

applies to *pleadings*.  Plaintiff makes no attempt whatsoever to justify his

characterization of a response brief in opposition to summary judgment as a pleading.

The court has found no authority that would support this interpretation.  Rather, Rule 7

narrowly defines the term "pleading" to only include seven categories of filings (e.g., a

complaint, an answer, a third-party complaint, etc.).  *See* Fed. R. Civ. P. 7(a)(1-7).  Briefs

in support of or opposition to summary judgment are not on the list.  Moreover, this court

recently rejected this same argument in the context of a request to amend a brief in

---

[2] It would appear that one of the arguments Defendants were forced to leave out of their reply brief is that Plaintiff ran afoul of the Local Rules when he allegedly failed to set forth a proper Statement of Material Facts in Dispute in his response.  *See* S.D. Ind. L.R. 56-1(b).  Refusing to let a good argument go to waste, Defendants decided to include this in their response to Plaintiff's Motion to Correct Brief.  Yet, in the words of the Seventh Circuit, "This perfectly ordinary argument is out of place."  *United States v. Mosley*, 967 F.2d 242, 243 (7th Cir. 1992).  Plaintiff's two proposed changes are to the page numbers of evidentiary citations.  The amendments would not affect the format of his brief, and thus would have no impact on the error raised by Defendants.  The court declines to consider this argument because it was improperly raised.  *See Cuevas v. United States*, 317 F.3d 751, 752 (7th Cir. 2003) ("[D]istrict courts have considerable discretion in interpreting and applying their local rules.").

17

support of a motion to dismiss: "Defendant argues that his amendment is permissible under Fed. R. Civ. P. 15.  Rule 15, however, applies to pleadings, not briefs . . . ." *Philpot v. 420 Magazine, Inc.*, 1:14-cv-01790-RLY-MJD, 2015 U.S. Dist. LEXIS 60014, at *6-7 (S.D. Ind. Feb. 20, 2015) (internal citation omitted).  *See Weems v. Potter*, 68 F. App'x 734, 736 (7th Cir. 2003) ("Rule 15(c) governs only the amendment of complaints, not briefs.").  Thus, Plaintiff's motion finds no support in Rule 15(a).

Regardless of authority, Plaintiff's amended brief is unnecessary.  Defendants vehemently argue against Plaintiff's motion because they believe the proposed amendments would have "a substantial impact" on the court's decision to grant or deny summary judgment.  Defendants should rest easy, as their fear is unfounded.  Defendants appear to be laboring under the mistaken belief that the court is precluded from examining any evidence that is not specifically cited in a brief.  That is simply not true. While it is accurate that, under the Local Rules, a district court has "no duty" to consider evidence in the record that is not directly cited, S.D. Ind. L.R. 56-1(h), the rule does not prohibit a court from doing so.  Indeed, Federal Rule of Civil Procedure 56(c)(3) explicitly states, "The court need consider only the cited materials, but it may consider other materials in the record."  In fact, the court may even grant summary judgment on grounds not raised by either party. Fed. R. Civ. P. 56(f)(2).  Thus, Plaintiff's erroneous cite to page 109 of a deposition when he should have cited pages 108 to 111 is certainly not a "fatal error," as Defendants claim.  *See Spolnik v. Guardian Life Ins. Co. of Am.*, 94 F. Supp. 2d 998, 1009 (S.D. Ind. 2000) (denying the plaintiff's motion to amend his response to the defendant's motion for summary judgment because "even if the proposed

18

amendment were allowed, the court's ruling on Guardian's motion for summary judgment would be the same").

It bears emphasizing that this is not a case where the non-movant failed to cite to any admissible evidence whatsoever.  The citations are there; they are just incorrect.  Defendants rely heavily upon the Seventh Circuit's recent decision in *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843 (7th Cir. 2015), but that reliance is misplaced.  The plaintiff in *Packer* "attached numerous affidavits, depositions, and other documents to her summary judgment memorandum" but failed to "cite specific parts of that record in support of relevant factual arguments."  *Id.* at 849.  In other words, the *Packer* court was concerned with how the plaintiff had "supplied general citations to affidavits or depositions without directing the court to any particular page or paragraph number."  *Id.* at 848.  That is not at all what occurred in this case.  Here, Plaintiff did not simply cite to the entire deposition in support of his argument.  Instead, he actually did cite to a specific page in the document.  His citation was simply off by a few pages.  *Packer* is consequently inapplicable to the instant case.

The court finds that Plaintiff's motion is untimely, unnecessary, and unsupported by any legal authority.  Therefore, Plaintiff's Motion for Leave to Correct Brief must be denied.

## IV. Defendants' Motion for Summary Judgment

Plaintiff brings both federal law claims and state law claims.  The court discusses each in turn.

### A. Federal Law Claims

Plaintiff asserts that the acts and omissions of Det. Burgess and Sgt. Butler constitute unreasonable seizures.  It is well established that "[t]he Fourth Amendment prohibits unreasonable searches and seizures." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).  Det. Burgess and Sgt. Butler argue that summary judgment is warranted because they are entitled to qualified immunity.[3]

### a. Qualified Immunity Standard

Qualified immunity is a "powerful shield," *Gregorich v. Lund*, 54 F.3d 410, 413 (7th Cir. 1995), that insulates "federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The Supreme Court has stressed that this doctrine "is designed to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Morse v. Frederick*, 551 U.S. 393, 429 (2007)

---

[3] In his Response, Plaintiff argues that, in addition to Sgt. Butler and Det. Burgess, Sgt. Croddy is not entitled to qualified immunity. Yet, Plaintiff's Complaint does not allege any federal claims against Sgt. Croddy, only state law claims.  "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)).

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).  Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

### b.  Fourth Amendment Claim Against Det. Burgess

The court first considers whether Det. Burgess violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures when he obtained an arrest warrant for Plaintiff.  As Defendants emphasize, "Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983 suit for false arrest."  *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992).  Plaintiff invokes a limited exception to this rule that hinges on the truthfulness of the probable cause affidavit used to obtain the arrest warrant.  Thus, Det. Burgess violated Plaintiff's rights only if he "knowingly, intentionally, or with reckless disregard for the truth, ma[de] false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue."  *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (citations and quotation marks omitted).  This language from *Hart* effectively requires a showing of three elements: (1) there are false statements in the probable cause affidavit; (2) the officer who made those false statements did so knowingly, intentionally, or with a

21

reckless disregard for the truth; and (3) probable cause does not exist without those false statements. *Id.*

Plaintiff satisfies the first element by directing the court to two false statements in the Probable Cause Affidavit: (1) Plaintiff was informed *twice* that everything was fine at Culhane's residence; and (2) "Even after *Police* notified James that everything was fine he was using police to harass Katrina." Initially, the Probable Cause Affidavit states that Plaintiff was informed on both October 3, 2012 and October 4, 2012 that "everything was ok." This is not true. According to the transcripts of the 911 calls, Plaintiff was only informed of the results of a welfare check once, on October 3. This was the result of Plaintiff's first welfare check. There is no evidence in the record that suggests Plaintiff was informed of the results of a welfare check on October 4.

Defendants attempt to skirt this issue by arguing that Plaintiff was nonetheless informed of the status of another welfare check on October 10. This is misleading though. During that call, the dispatcher told Plaintiff that officers did not conduct the welfare check he had requested earlier that night pursuant to Sgt. Croddy's order. The dispatcher stated, "It's-it's something to have to do with-with what the sergeant basically has told the officer, so I guess they've already checked on and everything is fine there." (Audio Transcripts, Inv. 7 at 2). As the transcript makes clear, the dispatcher was merely speculating that the officers had determined Plaintiff's daughter was safe. Construing the facts in the light most favorable to Plaintiff, the court finds that the dispatcher did not actually inform Plaintiff of the status of a welfare check. However, even if the court

22

agreed with Defendants' interpretation, that would not change the fact that Plaintiff was not told the status of a welfare check on October 4.

The second statement highlighted by Plaintiff ("Even after Police notified James that everything was fine he was using police to harass Katrina.") is technically false. Plaintiff seizes upon the phrasing "*Police* notified James that everything was fine" because an *officer* never told him that. While it is clear that a dispatcher told Plaintiff as much on October 3, there is no evidence to suggest that an officer ever provided Plaintiff with the results of a welfare check. Also, this statement is misleading because the phrase "[e]ven after Police notified James that everything was fine," refers back to the *two* alleged instances of Plaintiff learning his daughter was safe. As discussed above, this only happened once.

In regards to the second element from *Hart*, Plaintiff does not argue that Det. Burgess knowingly or intentionally made these false statements. Rather, Plaintiff contends Det. Burgess recklessly disregarded the truth. "[A] 'reckless disregard for the truth' can be shown by demonstrating that the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt' their accuracy, or failed to disclose facts that he or she 'knew would negate probable cause.'" *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003)). Plaintiff does not explain how Det. Burgess did any of these. He merely avers, "Burgess was plainly incompetent in writing a Probable Cause in which he had no idea who or what was the source of the central fact of the case-that Police informed [Plaintiff] of the results of the welfare checks." (Plaintiff's Response at 22).

23

As an initial matter, there can simply be no question that an officer is entitled to rely on information gathered by other officers when drafting a probable cause affidavit:

> [F]or federal constitutional purposes "[a] police officer need not personally witness the behavior giving rise to the probable cause—even if there must be personal observation according to a state statute." . . . [W]e bear in mind the collective knowledge doctrine, under which a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works.

*Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015) (quoting *Chathas v. Smith*, 884 F.2d 980, 987 (7th Cir. 1989)).  *See United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *United States v. Spears*, 965 F.2d 262, 277 (7th Cir. 1992) ("In determining whether probable cause exists, a magistrate is entitled to regard an affiant's fellow law enforcement officers as reliable sources.").  Here, Det. Burgess testified that he obtained the information in the Probable Cause Affidavit by, *inter alia*, speaking with officers and reviewing police reports.  (Burgess Dep. 35:3-8, 36:20-37:8).

Even though the Probable Cause Affidavit contains two false statements, there is no evidence to suggest that Det. Burgess entertained serious doubts as to the accuracy of the information or had obvious reasons to do so.  In his deposition, Det. Burgess did not remember *which* officer told him that Plaintiff had been informed about the welfare checks.  (*Id.* 37:14-18).  However, he was unequivocal about the fact that *some* officer had told him:

Q: Are you even certain that an officer told you this?

24

A: I was certain of two-and-a-half years ago.

Q: [A]s you sit here today, are you certain that . . . one of the other policemen besides the Sergeant Croddy told you that . . . Mr. Fuson had been informed?

A: Yes.

Q: But you just don't know who that is?

A: But I don't know who.

(*Id.* 37:19-38:4).  Sgt. Croddy claims that he informed Plaintiff about the results of his welfare checks and then relayed that information to Det. Burgess.  (Croddy Dep. 79:9-11 ("I believe I told [Det. Burgess] that I had called [Plaintiff] and told him not only that his daughter was okay, [but also] that there's a protective order involved . . . .")).  Even if the court assumes Sgt. Croddy knowingly lied to Det. Burgess about making that call, Plaintiff fails to show that Det. Burgess had any reason to suspect Sgt. Croddy was lying.

Plaintiff also presents no evidence that Det. Burgess failed to disclose additional information that would negate probable cause.  *Betker*, 692 F.3d at 860.  Mere speculation does not establish a genuine issue of material fact.  *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("[S]peculation, hunches and intuition cannot defeat summary judgment.").  Accordingly, Plaintiff has failed to satisfy the second element under *Hart*.  The court need not reach the third element and decide whether probable cause existed without the two false statements, as a showing of all three elements is required in order to overcome Defendants' invocation of qualified immunity.

Because Plaintiff has failed to show that Det. Burgess violated his clearly established rights, the court finds that Det. Burgess is entitled to qualified immunity on Plaintiff's Section 1983 claim.  Summary judgment for Defendants is required.

### c. Fourth Amendment Claim Against Sgt. Butler

Second, the court considers whether Sgt. Butler violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures when he approached him at Ivy Tech.  "It is well established that a seizure does not occur merely because a police officer approaches an individual and asks him or her questions."  *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015).  The Seventh Circuit has "recognized that there are three basic categories of police-citizen interactions":

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime.  The second category is an investigatory stop, which is limited to a brief, non-intrusive detention.  This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime.  The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning.  This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (quoting *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)).

Defendants primarily argue that the encounter between Plaintiff and Sgt. Butler falls into the third category.  As an argument in the alternative, they contend that, if this was a category two encounter, Sgt. Butler had the necessary suspicion.  Plaintiff argues

this was a category two encounter and, for purposes of summary judgment, the court construes the facts in his favor and assumes that this incident falls under category two.

Sgt. Butler did not violate Plaintiff's constitutional rights because he had "specific and articulable facts sufficient to give rise to a reasonable suspicion that [Plaintiff] ha[d] committed or [wa]s committing a crime." *Shields*, 789 F.3d at 743. In fact, Sgt. Butler had two legitimate law enforcement purposes for seizing Plaintiff. First, Squire asked Sgt. Butler to "advise [Plaintiff] to stay away from his parents' house." (Butler Dep. 13:2-4). Squire was concerned for his parents' safety because he felt Plaintiff's letter was intimidating, and Sgt. Butler thought the concern was reasonable. (*Id.* 13:6-14:2). *See* Ind. Code § 35-45-2-1(a) (defining misdemeanor intimidation under Indiana law).

Second, it is undisputed that in the process of attempting to locate Plaintiff so as to address Squire's concerns, Sgt. Butler learned of Culhane's harassment complaint against Plaintiff. (Butler Dep. 14:21-16:24). Specifically, Sgt. Butler called Culhane to get Plaintiff's Ivy Tech class schedule, and Culhane said "she had a protective order, and that he was sending the police to her house frequently to check on the welfare of their kids, kid, and that she felt he was harassing her that way." (*Id.* 19:2-9). In Indiana, "[a] person who knowingly or intentionally violates . . . a protective order to prevent domestic or family violence . . . commits invasion of privacy, a Class A misdemeanor." Ind. Code § 35-46-1-15.1(1). Regardless of which incident the court considers, there can be no doubt that Sgt. Butler had the reasonable suspicion required under *Shields*.

Plaintiff attempts to avoid summary judgment by emphasizing (1) the alleged friendship between Sgt. Butler and Squire, (2) Sgt. Butler's alleged verbal abuse, and (3)

27

Sgt. Butler's alleged verbal threat regarding Plaintiff's custody case.  First, there does appear to be a genuine issue of fact as to how well Sgt. Butler and Squire are acquainted. However, that fact is not *material*.  *See Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) ("A 'material fact' is one that affects the outcome of the suit.").  Even assuming, *arguendo*, Sgt. Butler is close friends with Squire, the court's analysis remains unchanged.  Sgt. Butler had two legitimate law enforcement purposes for speaking with Plaintiff.

Second, Plaintiff's assertion that Sgt. Butler "exploded" and screamed in his face does little to advance his case.  Quite simply, the Fourth Amendment does not protect citizens from being treated rudely by police officers.  *See Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993), *aff'd*, 23 F.3d 410 (7th Cir. 1994) ("[C]itizens do not have a constitutional right to courteous treatment by the police.  Verbal harassment and abusive language, while 'unprofessional and inexcusable,' are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." (quoting *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987))); *Jackson v. Liberty Cty.*, 860 F. Supp. 360, 363 (E.D. Tex. 1994) ("[T]he plaintiffs complain that [Deputy] Fenton was rude and unprofessional. Claims of hurt feelings, humiliation, and other heartfelt, yet objectively trivial indignities, are not of Constitutional moment and cannot withstand summary judgment.").

Third, Plaintiff has not demonstrated that this alleged threat by Sgt. Butler violated a clearly established right.  He had an affirmative duty to do so in order to survive summary judgment: "Once qualified immunity is raised, *the plaintiff* has the burden of establishing that his or her rights were violated and that the law concerning the proffered

right was clearly established at the time the challenged conduct occurred." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (emphasis added) (internal citations and quotation marks omitted). *See Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) ("Although 'clearly established' does not require a case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate." (quoting *al-Kidd*, 563 U.S. at 741)). The court finds that the question presented in this case (whether a police officer's verbal threat to intervene in a civil lawsuit, that is unaccompanied by any type of physical violence, in the course of a Fourth Amendment seizure violates a statutory or constitutional right) is not "beyond debate." *See City & Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775-76 (2015) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.") (internal citations and quotation marks omitted).

Plaintiff's only argument that even touches upon this question is that Sgt. Butler's actions constitute criminal intimidation under Indiana Code § 35-45-2-1(a). Plaintiff cites no case law to support that argument. In contrast, Defendants cite to *Jones v. Sweeney*, where the U.S. District Court for the Northern District of Indiana granted summary judgment in favor of defendant police officers on the plaintiffs' state law claim of intimidation. No. 3:98-cv-00592-CAN, 2000 U.S. Dist. LEXIS 15702, at *16 (N.D. Ind. Oct. 26, 2000). In addition to holding that there was private right of action for a civil intimidation claim under Indiana law, the *Jones* court noted, "By the nature of the

position, a police officer's duty includes some degree of intimidation as it is described in

[Indiana Code § 35-45-2-1(a)]." *Id.* Moreover, a sister district court recently held,

"[V]erbal threats by police officers, '[a]lthough indefensible and unprofessional, . . . are

not sufficient to state a constitutional violation cognizable under section 1983.'" *Hiller v.

Farmington Police Dep't*, No. 3:12-CV-1139 (CSH), 2015 U.S. Dist. LEXIS 100558, at

*44 (D. Conn. July 31, 2015) (quoting *Jermosen v. Coughlin*, 878 F.Supp. 444, 449

(N.D.N.Y. 1995)). *Accord Burton v. Livingston*, 791 F.2d 97, 99 (8th Cir. 1986) ("[I]n

the usual case mere words, without more, do not invade a federally protected right.");

*Bowles v. New York*, 37 F. Supp. 2d 608, 613 (S.D.N.Y. 1999) ("[V]erbal harassment or

threats alone do not constitute a violation of any federally protected right and are

therefore not actionable pursuant to 42 U.S.C. § 1983."). Accordingly, several cases

suggest that Sgt. Butler's alleged threat, while unprofessional, does not run afoul of

Indiana's intimidation law or the U.S. Constitution.

Because Plaintiff has failed to show that Sgt. Butler violated his clearly

established rights, the court finds that Sgt. Butler is entitled to qualified immunity on

Plaintiff's Section 1983 claim. Summary judgment for Defendants is required.

### B.  State Law Claims

Because the court has granted summary judgment in favor of Defendants on all

federal claims, Plaintiff's state law claims are the only remaining claims in this action.

Those claims include false arrest, malicious prosecution, intentional infliction of

emotional distress, and negligence against Det. Burgess, Sgt. Croddy, and Sgt. Butler;

negligent hiring, training, and supervision against the City; and vicarious liability against

the City.  Accordingly, the court must determine whether to exercise its discretion and retain jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a), or to dismiss them pursuant to 28 U.S.C. § 1367(c)(3).  Defendants' motion for summary judgment was fully briefed by the parties as to all claims, but no party addressed supplemental jurisdiction.

A district court "may decline to exercise supplemental jurisdiction" over state-law claims if the court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims, which the plaintiff can then prosecute in state court."  *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (citations omitted).  "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law."  *RWJ Mgmt. Co. v. BP Prods. N. Am.*, 672 F.3d 476, 479 (7th Cir. 2012) (internal citations and quotation marks omitted).  The Seventh Circuit has identified three exceptions "that may displace the presumption":

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480 (internal citations omitted).

None of the three acknowledged exceptions apply here.  First, the statute of limitations has not run on Plaintiff's state law claims.  Indiana law provides that "if a

plaintiff commences an action and . . . the plaintiff fails in the action from any cause except negligence in the prosecution of the action," the plaintiff may then bring a new action by the later of "three (3) years after the date of the determination . . . or . . . the last date an action could have been commenced under the statute of limitations governing the original action."  Ind. Code § 34-11-8-1.  Second, substantial judicial resources have not been expended on this matter.  This case is less than two years old, and a review of the docket shows that, outside of the instant motions, there has only been a single contested motion filed in this case.  Aside from conducting a few conferences, the court has expended relatively minimal resources on this case.  Third, the court is not prepared to say that it is "absolutely clear" how the state law claims should be decided.  Based on the parties' briefing, it appears that many of the state claims hinge on whether there was probable cause for Plaintiff's arrest.  The court did not reach that issue in its analysis of the federal claims.  *See Howlett v. Hack*, 794 F.3d 721, 728 (7th Cir. 2015) ("In a situation like this one, where the state-law claims have not been the focus of the litigation, the better practice is for the district court to relinquish its jurisdiction over them.").

Because none of the three exceptions apply in this case, this is not one of the "unusual cases" where exercising supplemental jurisdiction is appropriate.  *Burritt*, 807 F.3d 239 at 252.  Therefore, Plaintiff's state law claims shall be dismissed, and he will be free to pursue them in state court.

## IV. Conclusion

For the foregoing reasons, the court **GRANTS IN PART** Defendants' Motion for Summary Judgment (Filing No. 43).  The motion is granted with respect to Plaintiff's federal law claims.  The court declines to exercise supplemental jurisdiction over the remaining claims, and therefore **DISMISSES WITHOUT PREJUDICE** all of Plaintiff's state law claims.  The court also **DENIES** Plaintiff's Motion for Leave to Correct Brief (Filing No. 59).

**SO ORDERED** this 31st day of March 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

33